Houston Specialty Insurance v. Vaughn, in Old Florida May it please the Court, my name is Robert Darrah, and I represent Houston Specialty. Basically, I sort of look at this case in three aspects. One is that the trial court erred in applying the Claims Administration Act to Houston Specialty. It was then used to find that Houston Specialty had not complied with it. That's erroneous for two reasons. One, we are a surplus lines carrier, not subject to the Act. And two, because even if the Act applied, we complied. The second issue is that the Court then failed to grant summary judgment to Houston Specialty on non-cooperation. And then the third is whether or not Mr. Mendenhall had an obligation to cooperate with Houston Specialty. Those two latter issues go by the wayside if you are wrong on the first one, right? Correct. So let's talk about that one if we could first. How is it that an insurance company doesn't know for over two years what policy it has issued and affirmatively represents that it has issued a different policy to the policyholder and then isn't held to that? This is not a mistake as I read the record and I read a lot of it because I too was wondering why the judge had done what she ultimately did. But this is not a mistake of turning over the wrong policy in discovery and then recognizing a mistake or maybe even including the wrong policy in your deck action complaint and then saying, oh, we made a mistake, here's an amended complaint and here's the correct policy. It seems like your client did nothing for a long, long time to ascertain the policy it had issued and everybody litigated on the assumption that you had issued a different policy. Why shouldn't you be held to that? First, I don't want to nitpick words, but let me separate one thing. The policy itself, the language of the policy is identical in both. Except for the surplus lines language, which is critical. Yes. That is true. I don't agree that the surplus lines language is critical, but it is statutorily required as evidence that that policy was. If your client issues, although it may not be authorized to do so, if your client issues a policy through an authorized broker or agent that doesn't have that language, is it a surplus policy? We would be a surplus lines carrier only authorized to do that. I know. I'm telling you, if you do something that the law doesn't authorize you to do and you issue a policy without the required statutory language, have you issued a surplus policy or a standard lines policy? There is no case that deals with that issue. I know. That's why I'm asking you the question. I would make the argument that that is a de minimis requirement in this case for this reason. We're going to go case by case? We have to write an opinion. Do you want us to say, well, in this particular case, the language doesn't matter, but we're not deciding other cases where it will matter? No, Your Honor. And here's the reason. Well, do you want to stick to the de minimis argument? Only to one extent, and that is if the court finds that the judge was right under Rule 37 in sanctioning the insurance company in this manner, which we contend we were not, and the main reason we were not is two things happened that are clearly admitted by the appellees, and that's this. Number one, in 2012 — Now you're departing from the language on the policy. Are we talking about the judge's discretion? No. I'm talking about the language on the policy. Okay. That language was physically on the policy actually delivered to the insured in 2012. And it didn't just stop there because the statute also requires more. The statute requires that there be evidence that the insured had no other option to get coverage except a surplus lines policy. The retail agent, the insured's agent, was the one who actually sat down with the insured according to the undisputed testimony and said to him, this is a surplus lines policy. It's different. So that was an absolute undisputed fact throughout this case. So there's no question this insured had actual knowledge and produced a copy of the policy belatedly in discovery that contains that language. The reason why it was not attached to the complaint was because it was provided to Houston Specialty through its vendor without that language on it. I understand that. I've got a little more specific question. Were you the lawyer at the 30B6 deposition? Yes, Your Honor. You're talking Houston Specialty? I mean, well, I was at both Houston Specialty and the insured. You were the lawyer there. One of the things they say is that deposition's in progress. It's been going on a while. And you reach in your briefcase and pull out the surplus lines policy. I'm trying to think of any possible reason why a lawyer who knows that he's got this bombshell that totally changes the case, or at least may totally change the case, would sit in a deposition in progress with that in the briefcase and not pull it out until later. That's my question. We got it the day before, emailed it the day before. When talking to counsel, he said he did not have a copy. And at that point, that is when we brought out a copy, in addition to having sent it to him the day before. But you had already sent it to the other lawyer? Emailed it the night before. We got it from their agent, Mr. Sweatt, Your Honor, at that point in time. Yeah, you're talking to their agent without them there, but that's not a question. I just wanted to make sure, and maybe you answered it. They said in the brief that I had the impression that the deposition's ongoing and you're sitting there with this secret in your briefcase. No, you say you gave it to them the night before. We gave it to them when we got it. All right. And so we got it twice, once from their agent during the discovery period in response to some requests that we made with their permission. Their counsel gave us, All Florida's counsel gave us permission to contact the agent. All right. Yeah. I mean, we've got an email that's, I believe, in the record. Sorry. He said you can get that information directly from them. Now, we also went back and tried to get it from our vendor. And in doing that, we got another copy, which we produced, which was identical. That, to me, is the most salient fact on this issue, is we asked them for it. In our initial disclosures, we said you have a copy of the original policy and that's relevant. We asked for them to produce it to us. They produced it to us seven days before the close of discovery. And when they produced it to us, then we went back or double-checked it and said, yep, you're right, this is the one that is the correct one. How would you double-check and know that if you didn't have a copy of it yourself? Yes. We go back through our vendor. There's a two-step process. There's the folks who actually put the policy together. Then there's the folks who are the surplus authorized agents in the state, the wholesale agents, who then put that language on it, deliver it to the retail agent, SWEAT or STAR, and then turn around and give it to the insurer. Why couldn't you have found that information out before? Candidly, Your Honor, it had not been brought up as a problem that there was not the stamp on it. We got it the first time from our vendor without having the stamp on it. But you didn't make the argument about being a surplus lines carrier until relatively late in the proceedings. You weren't making that argument from the beginning. They didn't raise that issue until— No, you, you raised the issue. They didn't raise the issue until they raised it as an affirmative defense in September of 2015. I may have the year wrong, but it's right— You're saying they raised the point for the first time in the case— Yes. What they did, Your Honor, was— —in the affirmative defense. Yes. They filed a motion to dismiss. The Court ruled on the motion to dismiss just a couple of weeks before the close of discovery, and then they filed their answer in affirmative defense. Now, their affirmative defense does not say you failed to comply in giving us a copy of the policy. It says you failed to comply with the Claims Administration Act. Claims Administration— Well, that's the same thing. Not just that on the Claims Administration Act. Well, they're saying you weren't a surplus carrier. They didn't say that. Well, when they say you didn't comply with the Act, that's in effect what they're saying, isn't it? No, Your Honor. All right. The Act applies to an admitted carrier, and it has requirements in it. Our defense to their defense would be that we are a surplus lines carrier, and that's the reason that came up, not until they raised the affirmative defense. So how long was it between the time they pleaded the defense and the time you found the policy with the language and gave it to them? I'd have to go—when you say gave to them, they already had it. But gave it to them again, in a sense, was it was right at the end of discovery. I'd have to go back and look. How much time between? Less than 30 days, as I recall, Your Honor. I'd have to go back and look at the actual day their answer in affirmative defense was filed and the day that we then had discovery ending and the day we produced it. But it was a 30-day period of time, essentially, Your Honor. That's why there were subsequently additional discovery that the court allowed on the question of that policy was because all of that came up in about a 30-day period. I've got a different question. You're over your time, but this is a different question that hadn't come up. I'm trying to figure out how you think this was going to work when you tried to intervene in their state court lawsuit. So they both agree, for example, that Mendenhall is an employee, and you want to tell the jury that he's an independent contractor. How's this going to work? Are you going to be at the trial? No, Your Honor. So nobody's going to be taking a different position. Everybody's going to agree he's an employee. That's going to be the only evidence at the trial. But you want to put on the verdict form a question whether he's an employee or an independent contractor? We think that the purpose of intervening, Your Honor, is to make sure the issues are clear at the trial court level. Let me give you an example. Okay, but is it true or not true that you wanted to put on the verdict form a question whether Mendenhall was an employee or an independent contractor? Yes. So how stupid do you think the jurors are? You don't think the jurors are going to figure out this goes to insurance coverage? We wouldn't be there. And the purpose of putting it, I don't believe, let me explain to you. You don't think jurors are that smart? I mean, let me just tell you, the jurors I get. I totally believe in the brilliance of the jurors and the jury system. But I believe the judge, if we played this out hypothetically, the judge would not have put that question on the form. Right? Because there's no evidence that anybody's going to submit at trial. The obligation that Florida imposes on the insurer when there's a coverage issue that overlaps in the underlying case and in the coverage case is to try to get the trial court to clarify it so that it helps deal with the coverage issue. Then what happens is if we don't ask, the burden is on us to clarify it in the trial of the coverage case. If we do ask and the insured does not go along with that, then the burden is on the insured to do that. Can you cite any case where the Florida Supreme Court, or for that matter a DCA or even a trial court other than this one, has let the insurance company intervene in circumstances like this? Yes. And I didn't, we didn't brief that issue. I can give the court a list. There are literally dozens and dozens. In fact, the appellate court has. That's turning the whole case into declaratory judgment action in the middle of a damage action. No. The reason the court, the Florida courts approved. These are dozens of DCA cases? Yes. The reason the court authorizes the insurer to intervene is just to ask. Because otherwise, if the verdict itself in the underlying case is unclear, then what the coverage judge and court has to do is say, well, what did the jury do? Who's responsible for proving what the jury does? Is it us? You just tried the issue of whether he's an employee or an independent contractor, which, by the way, you tried and lost. I couldn't hear the last part of that. You tried and lost. Judge Kavakovich presided over that trial and you lost it, right? Yes. But that's after all of the intervention and it's after what we were trying to accomplish. But isn't that the way it's supposed to happen? I mean, well, we could spend all day. I don't understand how you denied that you had a duty to defend. It seems to me it couldn't be more clear that you had a duty to defend. Now, duty to identify is a different question. But under Florida law, the duty to defend is determined under the eight corners rule. Read the complaint, read the policy. Some exceptions, but not one here. I mean, this complaint says Mendenhall's an employee. There is an exception here, and the exception is for who is an insurer. The case is cited in our brief. Talk about who is an insurer. Mr. Mendenhall, every bit of information that was provided to us from all Florida was he signed an independent contractor agreement, he's an independent salesman. We asked for his W-2 or his 1099 and they wouldn't give it to us. But it wouldn't be the first time that somebody treated their employees as an independent contractor. It saves money on taxes. Judge Kennedy, I don't think that's right. I mean, I do think that's not the first time. I think the process is wrong there. But aren't you supposed to determine the duty to indemnify from the complaint and not from other information you may have? And until a court makes a determination based on evidence, then maybe your duty to defend goes away. But at the beginning, you've got to provide a defense? No, Your Honor. And the classic example is — If they say fact is X and you believe the fact is Y, and if fact Y is correct, there's no coverage. You don't have to defend until you prove fact Y? There are exceptions for things like late notice. There are exceptions for things like — That's a different question altogether. All of the conditions in the policy — We're talking about whether or not he's an employee. We're talking about who is an insured from the coverage standpoint. Who is an insured? He's not an insured as an independent salesman. He's not an insured as an independent contractor. He might be — And the allegation is he's an employee. They had always — Well, if all of the true facts, the people that know are all Florida and Mr. Mendenhall and Mr. Fulford are telling us that he is an independent contractor and they are not providing us with a single indicia of evidence that he's not, that doesn't make the fact that it's alleged in the complaint true. Okay. The cases that say that who's an insured is an exception to the eight corners rule, those are in your brief? Yes. I didn't go reread those. All right. Thank you. Thank you. Mr. Martinez. Good morning. May it please the Court. Just a point of clarification on the, you know, taking the policy out of the briefcase. Mr. Darrow, I believe, is mistaken and is confusing an e-mail.  I believe he's mistaken on that. There is pointed out in our briefs and in the record that his office received an e-mail with the policy the night before the deposition. And the next day is the first time they presented it, two-thirds, three-quarters of the way through that deposition. But I just wanted to clarify that. Does the record tell — do you agree that you know about it the night before? No. No, to the contrary. That's what I want to correct. Your brother says that you were told the night before. I believe he's mistaken. There is an e-mail the night before from Swetton Crawford to his office delivering the policy to him. I believe he is confusing that e-mail perhaps with an e-mail that — You're saying that you first learned about it in the deposition. Unquestionably. Unquestionably. And if you read the transcript, it's readily apparent. I came out and just said, what's going on here? And we got into a big discussion about why hasn't this been produced? There's a break in the questioning. Is that what it was? No, it should be in the transcript. I don't think it was off the record. And then you said, no, I'm not going to ask questions about it now. I just got it. Sure. And you have to recall, right before that deposition, that was the third deposition of the corporate representative. Right before it, they had filed their request for judicial notice, which, by the way, was the first time surplus lines was even whispered. And this is after the close of discovery request for judicial notice to oppose our summary judgment. Because of that request for judicial notice, we knew we had to finish the corporate rep depot. So in the areas of designation, I said, let me inquire about surplus lines. They opposed it, and they prevailed. And we had an order from Judge Kovachevich saying you will not go into those questions. So we did not. In that context, three-quarters of the way through a deposition, they pull the policy out and say, by the way, we've been litigating, you know, we've had a trial now and a judgment and an appeal based on this policy, but here's a new one that should apply. At that point, I declined to ask questions because I had an order that had been issued the night or two before saying don't inquire. So I didn't. So I wanted to make that clear, that that deposition was the absolute first time that I was advised of this other policy. One of the arguments that Houston Specialty makes is that whatever blunders it may have committed, you, your client, had the policy from day one and was asked for it in discovery and didn't produce it until very late. And so why should it be penalized given that you had it within, your client had it within its possession, his possession at all times? Because it poisoned our litigation decisions in the meantime. And I'll explain. First of all, there was no request for a policy. The request for production was give us any documents that support your defenses. Our defense was you didn't issue a timely reservation of rights. So there is no document to produce. Our defense was not, hey, you issued — They never asked for the policy, for a copy of the policy? No. You will not find that in the record. And we cited in our briefs the actual discovery request. There was no request on our part for a — to us for a policy, and there was no reason for it. We had a certified original that had been produced no fewer than six times through these various three different lawsuits that were going on. One of those had been litigated to conclusion through a trial and appeal based on that policy that was submitted by Houston. The letter asking — But you had no reason to doubt that that was the policy and you didn't go ask your own client, where's the policy? Of course not. We had a certified original. There was — you know, in none of these complaints did Houston so much as allege that they were surplused, to give us some — Is there anything in the record that establishes that your client knew it was surplus coverage from the start, and what the legal ramifications of that were, what a surplus carrier was, for example? No. Nothing in the record? No. My client is a roofing contractor. They're laypersons. Well, your client's agent explained it to him. I'll put it that way. Well, Barry Scarr says, hey, every time I did this, the agent says, every time I did this, it was surplus lines. That's all we could find. However, every single year, there's a search for coverage. If there's a standard lines policy, that's — They have to go get surplus because they can't get the other piece. Yes. Yes. He says it was clear in his mind that it was surplus. But when my — there's no evidence in the record that my client was aware of that or the legal ramifications. And getting to the new policy itself, it does not comply for the reasons we've said in the brief. But what's important is, even if I had come across it, even if I had gone and, for some reason, I needed to go exclude possibilities that I didn't know existed, right, that it was surplus, because that wasn't whispered. And you have to remember, too, that in the letter asking us to reconsider the rejection of the defense, that letter cited to the claims administration statute. So we were under the impression that this was a 627 case, unquestionably. That it was not. That it was. That this was a standard lines policy. Right. Because even Chapter 627 was cited to by Houston in their letter asking us to reconsider the rejection of the defense. Now, while they're asking us to reconsider, we were waiting for the reservation of rights. They have 30 days. During the timeframe to reconsider, that letter didn't come. Therefore, there was no reason to reconsider the rejection. That's one of the litigation decisions that was poisoned at the time. There were several others that I could get into, but the prejudice, I think, is patent here. And one of the issues that Judge Kavakovich was troubled by, and you can see it in her order, was the manner in which this developed, which was the first time it was ever whispered, the first time in any record that you see the word surplus is at the close of discovery in the form of a request for judicial notice. That is what prompted us to ask, can we inquire about this at the third? And the third corporate rep depot was set for other reasons, but we said, hey, let us inquire. They objected. That was sustained, and we weren't allowed to get into it. And under those circumstances, that was troubling to Judge Kavakovich. She, therefore, reopened discovery, and it was three months, by the way. Mr. Darrow was mistaken when asked, how long between the time of judicial notice and the time that you're actually in the corporate rep deposition? It's fairly easy to determine, but the judicial notice was in September, and the actual dates are in Judge Kavakovich's order. The corporate rep deposition was December 16th. So that's three months later that they actually came up with it. And when we went through the record to find out, hey, when did Houston get a hold of this policy finally, that's when we saw the e-mail that the counsel had received the night before. And when you look at that e-mail chain, and this is in the record, it came within 24 hours of the request from Sweatt. There was an e-mail to Sweatt saying, do you have this? Within 24 hours, Sweatt sent it back. And so our contention was it was relatively easy to obtain. But that was a three-month delay, and that's one of the issues that Judge Kavakovich pointed out in her order was that nowhere in the record was she able to find any justification for that three-month delay. And because of that, she found that under Rule 37, no appropriate justification for the delay had been asserted or was to be found in the record. Let me ask you a different question. You might have been able to persuade me that, as a matter of law, you did not fail to cooperate. But if I understand the briefing, you haven't asserted that here. You don't assert that, as a matter of law, you didn't fail to cooperate and so we can affirm on that basis. I think your brief says you agree with Judge Kavakovich that that's a genuine issue for trial. I've got to think about that for a moment. No, it is not a genuine issue for trial because of the issue that we've been discussing here. Oh, I understand that. But if we disagreed on that and we got to the merits of the question, I guess what I'm saying is you might have persuaded me that you didn't do anything wrong, that when they tried to intervene and the lawyer that they retained to defend you said, I can't even go to the hearing, that things have changed and you've got every right to say, I'm sorry, I can't rely on your lawyer anymore. He didn't even show up at the hearing, which is going to be a pretty big deal. And so we're going to get our own lawyer. It seems to me you might have persuaded me that that's not a jury issue. That's not a failure to cooperate. But that's not an issue for us, right? I wish I had, now that you say that. But, no, you are correct.  All right. I'll go over some of the other points briefly. You know, the appellees argue that there's no case law to support the interpretation that we are advocating. But the statute is relatively clear. 624 says you're either authorized or unauthorized. Then there's an exemption that's carved out if you follow the law. And then you can avail yourself of that exemption if you qualify for it. There is an absence in this record of qualifying for that exemption, not only because of the policy, but because Judge Kabachevich was given no record evidence that this was even an eligible carrier. The request for judicial notice was a printout of a webpage that itself said you cannot rely on this, and nothing else was presented. There was no certificate of eligibility to issue surplus lines. There was nothing from the State of Florida that was submitted where she could draw a conclusion that they were, in fact, eligible to issue surplus lines covers. The record was devoid of it for that reason alone, not even getting into the policy language. The exemption, we don't have the qualifications for it. And then 627 says every policy issued, every policy, whether authorized or unauthorized, that's my parenthetical, every policy falls under 627 unless you qualify to be exempt from it. And to do that, you need to be an eligible carrier, which Judge Kabachevich didn't have enough evidence to support that, and you have to issue the policy with this language as it is. And even if we get into the, I'll call it the late-produced policy, even if we get into that, that doesn't qualify either. Their own corporate representative said that the piece of paper that they're relying on is not part of the policy. The statute requires that it be stamped on the cover page. Even if I had gone and found this thing in the cabinet of my client, if you look at it, the cover page looks no different. There's no stamp on it, nothing that would inform the casual observer. Did Judge, in one of her orders, Judge Kabachevich said that there was an issue about whether or not the second-in-time produced policy contained the relevant surplus lines language on a first page or, I think, a third or fourth page.  Did she ever make a factual finding about that issue in her later orders or figure out she didn't have to given her other bases for the ruling? She did in her first order on summary judgment where she denied summary judgment, where she identified there was a factual issue. Right. She did that. Exactly right. And my question is whether or not in issuing her final ruling, imposing the sanctions, and then granting judgment, whether or not she ever resolved that factual issue or just left it there. No. I think once she concluded that 627 applied, the fact that the Claims Administration statute hadn't been followed stopped the analysis. Right. It didn't matter anymore. Right. It's certainly there by inference. But that policy, the late produced policy, has no stamp on the cover page, which is one of the most important requirements. And the statute says must. It doesn't say, you know, significantly comply. It doesn't say, you know, do most of these. It has four portions, and each one of them uses the word must. And it's our contention that if you do not follow it, you don't qualify for the exemption, you fall back under 627 because 627 says that's where all policies go unless you have an appropriate exemption. Where does the late produced policy have the surplus lines language? On page 3. Not on the front. It's not on the cover page and it's not on the first page. It's on page 1. I mean, look, the statute uses different references for where these things have to be. One's got to be on the outside of the policy, and then one has to be on the first page of the policy. Correct. So it seemed to me this matched up pretty well. Now there's a third requirement that they may have missed. But those look to me to be exactly right. But on the late produced policy, it is the third page. It's the third page. And the first two are the jacket, right? I mean, the first two are the jacket and the third page is the first page of the policy. No, no, no, that's not how I recall it. I didn't bring all the record with me. But the first page is the, you know, it's got the, I call it the splash page, which is the logo and the company and it says policy issued by. The next page has, I believe, some signatures by, like, the president. And then the third page is where that loose page, which, by the way, their corporate rep said that's not even part of the policy. And we contend that the reason it must be stamped on the policy is because it must be stamped on the policy. The idea that a loose leaf can be inserted creates problems later, I think. Yeah, but the way this works is the surplus lines carrier is somewhere else. They don't do a business in Florida every day. So they've got this agent that does it, and the agent then can take their policy form, which they use all over the country or, for that matter, all over the world, and they can put some information on the outside of the policy. That's the agent's name. And then on the first page of the policy, they have to stamp this surplus lines information. Correct. Yeah, but it's got to be stamped on the policy. And the record evidence here is that there is no stamp on the policy anywhere. And the problem is one of evidence, which we face here today, which is at what point did that third page get put in there, and we have their own corporate rep testifying that that's not a part of the policy. That becomes problematic. In terms of the policy that my client found in their cabinet, there is no evidence that it was in their possession back in 2012. The evidence is that it was found in the cabinet in 2017. The corporate rep said he was unable to identify when that came into my client's possession because the file had been, in his words, cannibalized by so many lawyers in the interim. But it's important. So you think some lawyer cannibalized it by sneaking a policy in there? Oh, no, no, but it could have been delivered at a later time. We don't know. We simply don't know. Fair enough. Anyway, I'm down to 25 seconds. What's going up? Oh, it's going up. All right, so I'm over by 30 seconds. I think we have your case. Thanks, Judge. Mr. Durack. I'll work sort of backwards through some of that. We do have in the record the cover letter from 2012 from the SCAR, I mean, from, yes, the SCAR insurance agent to All-Florida enclosing a copy of the policy. His testimony was he delivered it face-to-face. Thanks to Mr. Fulford, a representative of All-Florida, it definitely was. In the record, his affidavit is at 188. His deposition is at 189. The 30B6 witness for All-Florida is at 192. In each of those, there is the policy that Mr. SCAR talks about delivering in 2012 with the language on it. Let me ask you a question. On this record, regardless of how it all shakes out, how could you get a judicial finding on Houston specialty being a surplus lines carrier as a matter of judicial notice? Isn't that a matter of proof? The judge has a great deal of discretion on that. The records have to be on file with the State of Florida. In addition to the documents out of the record that we produced at the judicial notice we gave the court. That's not something that's common knowledge, like knowing when sunrise was in Atlanta on August 15th. It is in the sense that we said to the court, if there's something other than this, here's the link. Because it's on file, it's public, that says down at the Department of Finance, which is where the insurance commissioner's office in Florida is, this is where it is. And you can see right there we're listed as a surplus lines carrier. Here are all the filings. If it was so easy to figure that out, why would you seek to preclude questioning from the corporate representative in the third deposition about your status as a surplus lines carrier? She was not the representative designated to cover those issues. That issue was already dealt with by the other witnesses that we designated. We actually designated as 30B6 witnesses the agents who were the vendors who were responsible for doing this, and they testified exactly about what they had done. And that your client was a surplus lines carrier? Absolutely. Early on in the case they did that?  When the judge extended the discovery during that time. Oh, that's after the fact. No, I'm asking you why you would object to – She was not designated on that issue. She was the claims representative. She would have no personal knowledge of that. She knows about the – Corporate reps don't have personal knowledge about a lot of things. They become educated about those things. Absolutely. That was not a topic we were expected to educate her on. We did educate her on the letters – How much is there to educate her on if you think it's a matter of judicial notice? She's got to go look. How difficult is that? They don't give us the topic. If they don't say this is the topic, that you're a surplus lines carrier, we don't have the ability to go – What did you provide with your request for judicial notice? I was disturbed about that issue. What did you provide? I'd have to go back and – Other than a statement that you want the court to take judicial notice. We provided some of the forms out of the filing, and I'd have to go back and look at the exact forms,  as a surplus lines carrier for the year – You provided everything from what you could determine whether it's a surplus carrier. Is that what you're telling us? Yes, and then – But not the policy that had the required statement. Yeah, but not the policy. Correct. Just the status of the company. Yes. The policy was in the insured's possession and the possession – But what's the relevance of the status of the company if the policy has to have the information on it? The only thing they're authorized to write is surplus lines insurance. Under 624, that makes them a surplus lines insurer. And then the question becomes, depending on the type of policies, et cetera, that are issued, where they put this language and what they do with it, whether they have to – if they do it – But the other – but the other side's right. Just because they don't have authority to issue a policy, if they issue a policy that's beyond their authority, they still have to comply with the Claims Administration statute unless they properly issue the surplus lines policy, right? No, and that is a decision this Eleventh Circuit has made already once before in the Lemme v. Direct General, which is 559 F. App. 706. It affirmed the district court where the district court said, and I quote, an unauthorized insurer who violates the surplus lines law does not transform the insurer's product into a general lines that must comply with 627. And that was the district court's decision that was affirmed. It was not – I'm not quoting from the Eleventh Circuit. I want to give you a chance to go back. The first thing I asked you was whether you pulled this out at the deposition, and you said, oh, no, we sent it to them the night before. Mr. Martinez says, absolutely not true. That is my recollection is we forwarded that email when we got it from the agent. When you say we, who is we? Me. So the easy matter, you've got an email where you're sending the policy. It may be a forwarding email that just says, here it is. So this would be easy to find out who's right about this. You get that in the record? Yeah, there's – I don't believe so, and I could be mistaken because, as I recall, it came in – So when it came up at the deposition and he said, oh, no, you're pulling this out right now? Did you say, oh, I sent it to you last night? I'd have to look and see if we said that on the record. But if I got it, I would have said it, but I might not have said it on the record. If the court wants that clarified, I'm happy to do a one-sentence clarification of that because I just candidly don't remember because it was two years ago, roughly. I know we turned it over immediately. I just don't remember if we turned it over. I'm 99% sure we turned it over that night, but it was large, too. So if it bounced back, we'd even have the rejection if it bounced back. I think we have your case. I'm out of time, Your Honor. Thank you. The court will be in recess until 9 in the morning. All rise.